NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-2565
_____

ERICA PLASO,
                              Appellant

v.

IJKG, LLC; IJKG PROPCO, LLC, a/k/a Newco;
IJKG OPCO, LLC, d/b/a Bayonne Medical Center
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-11-cv-05010)
District Judge:  Honorable Jose L. Linares
_____

Submitted Under Third Circuit LAR 34.1(a)
January 16, 2014

Before:  AMBRO, HARDIMAN and GREENAWAY, JR., *Circuit Judges*.

(Filed: January 21, 2014)
_____

OPINION
_____

HARDIMAN, *Circuit Judge*.

    Erica Plaso appeals the District Court's summary judgment in favor of IJKG, LLC;

IJKG PROPCO, LLC a/k/a Newco; and IJKG OPCO, LLC d/b/a Bayonne Medical

Center (collectively, BMC).  We will affirm, essentially for the reasons stated by the

District Court in its thoughtful opinion.

I

Plaso began working for MCR Martin, LLC, d/b/a Healthcare MCR (Healthcare), an Ohio-based consulting business, in January 2008. She was hired by Healthcare's President and Managing Partner, R. Brent Martin. Plaso's employment contract, which governed the terms of her tenure at Healthcare, provided that she would report to Martin, and that she "shall provide the Services as directed by [Healthcare] and in compliance with . . . the terms of the Client Engagement to which [she] is assigned." The contract obliged Healthcare to pay Plaso's salary and benefits, and to reimburse her for expenses incurred when she worked at a client's site. It also authorized only Healthcare or Plaso to terminate her employment with the company.

In February 2008, Martin assigned Plaso to work at Bayonne Medical Center, where he served as the Chief Restructuring Officer. Plaso worked at BMC five days a week, and per BMC's contract with Healthcare, interacted daily with BMC executives and employees. She received unfettered access to the hospital, and was provided BMC e-mail and telephone accounts, an access pass that identified her as a Healthcare contractor, and an office. She also gave assignments to two BMC employees and was asked by BMC to evaluate them, but on Martin's instruction did not do so. During Plaso's time at BMC, Martin was almost always on site, and she spoke and/or sent e-mails to him every day.

2

Martin established Plaso's work hours, and she asked him for permission to take leave or to work from home. Martin was the only individual to formally discipline Plaso while she worked at BMC.

At some point, BMC formed a new physicians outreach group, BMC Medical Associates (BMCMA), and Martin assigned Plaso to serve as the group's "practice administrator." In that role, Plaso represented BMC to physician practices in the community and trained BMCMA's future Vice President of Business to perform these responsibilities.

While Plaso spent the vast majority of her tenure with Healthcare assigned to BMC, she also worked for other Healthcare clients, including medical centers in California, Florida, Michigan, and Montana.

According to Plaso, Martin began making unwanted sexual advances in 2008. Specifically, she alleged that he forcibly kissed her in June 2008, sent her sexually suggestive text messages in May and June 2010, and made inappropriate comments (*i.e.*, telling her to wear "skirts only" at a work-related event, encouraging another co-worker in her presence to have sex with a BMC owner) throughout her time with Healthcare. On June 24, 2010, Plaso complained to BMC's Vice President of Human Resources, Jennifer Dobin, about Martin's sexual harassment. The same day, she informed Daniel Kane, the CEO of BMC, that she no longer wanted to work near Martin. Kane then asked her to

3

return home and to avoid Martin while she packed up her office. According to her deposition, Plaso believed that BMC would offer her employment, but her communications with Kane quickly ceased.

Neither Martin nor Healthcare formally terminated Plaso, and she remained on the company's payroll until October 2010. In August 2010, Plaso filed charges against Martin for employment discrimination with the Ohio Civil Rights Commission; she filed similar charges against Healthcare in October 2010 with the New Jersey Division on Civil Rights. These claims were settled in October 2010.

Almost a year after she settled her claims against Martin and his company, Plaso sued BMC in the District Court, alleging hostile work environment, *quid pro quo* discrimination, retaliation, and gender discrimination under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e-2. She also alleged three similar counts pursuant to the New Jersey Law Against Discrimination (NJLAD), N.J. Stat. Ann. § 10:5-1. These claims stem solely from Martin's alleged sexual harassment.

On May 14, 2013, the District Court granted BMC's motion for summary judgment, finding that BMC was not Plaso's "employer" for purposes of liability under Title VII and the NJLAD. *See Plaso v. IJKG, LLC*, No. 2-11-cv-05010, 2013 WL 2182233 (D.N.J. May 14, 2013). Plaso contended that BMC had formed an employment relationship with her in one of three ways: (1) as an employer; (2) as a joint employer; or

4

(3) as an "integrated entity" with her employer, Healthcare. In a persuasive opinion, the District Court rejected all three of Plaso's arguments, finding that Healthcare (not BMC) exercised control over Plaso's employment and that Plaso offered "only speculation and conclusory allegations" to the contrary. The District Court also found Plaso's argument in the alternative—that BMC would be liable for *quid pro quo* discrimination, even if she were only an independent contractor—unavailing.

Plaso filed this timely appeal.[1]

II

Plaso contends that summary judgment was improper because triable issues of material fact exist regarding her employment status. First, she maintains that the District Court ignored key pieces of evidence in the record that are material to her status at BMC. Second, Plaso argues that while the District Court properly identified the standards outlining the "employment" and "joint employment" relationships, it failed to apply those tests correctly. Third, Plaso claims that BMC and Healthcare are part of an "integrated enterprise," rendering it a single employer, and finally, that she is entitled to NJLAD

---

[1] The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367(a), and we have jurisdiction under 28 U.S.C. § 1291. We review the District Court's grant of summary judgment de novo. *Horvath v. Keystone Health Plan E., Inc.*, 333 F.3d 450, 454 (3d Cir. 2003).

relief as an independent contractor.[2]  We address each argument in turn.

A

Plaso focuses on four facts in the record that she claims were ignored by the District Court.  First, pointing to testimony in Kane's deposition, she alleges that Martin "structured" the environment at BMC and controlled how BMC employees interacted. Plaso thus urges us to draw the favorable inference that she, with whom BMC employees regularly communicated, was also a BMC employee.  The record undermines this argument, however, as Kane merely stated that Martin "structured" BMC's interactions with Healthcare employees.  Martin did not control BMC; to the contrary, he supervised the manner in which Healthcare's employees—including Plaso—interacted with BMC and the company's other clients.

Second, Plaso notes that she interacted daily with BMC executives and received assignments from them—indicia, she contends, that they "took part in controlling the manner and substance of [her] employment."  She points to her increasing responsibility at BMC—as BMCMA's "practice administrator" and her "supervision" of two BMC employees—as further material evidence of her employment.  These facts do not bear the

---

[2] In her complaint, Plaso alleged claims for *quid pro quo* discrimination and retaliation as an independent contractor under both Title VII and NJLAD.  Because she does not discuss the Title VII issue in her opening brief, she has waived that issue on appeal. *See United States v. Pelullo*, 399 F.3d 197, 222 (3d Cir. 2005).

6

weight Plaso assigns them; they merely highlight the nature of Healthcare and BMC's contractual relationship. Healthcare, as Plaso's employer, assigned her to perform certain functions: Martin outlined Plaso's responsibilities, and BMC provided some direction within those functions in accordance with its contract. For example, Martin informed Plaso that she would serve as BMCMA's practice administrator, and he directed her to cease performing this function. Similarly, Plaso declined to submit a performance evaluation for one of BMC's employees at Martin's direction. That BMC provided some direction in the work assigned to Plaso by Healthcare does not raise a dispute of material fact as to whether she was an employee of BMC.

Third, Plaso points to Martin's role as BMC's Chief Restructuring Officer as "compelling evidence" the District Court ignored. In fact, the District Court did address Martin's role at BMC, finding that Plaso failed to present specific evidence as to how Martin's job title would render her a BMC employee. Furthermore, we have held that "mere nomenclature" is insufficient to demonstrate a supervisory relationship. *See Jensen v. Potter*, 435 F.3d 444, 453 n.4 (3d Cir. 2006) (citing *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1033 (7th Cir. 1998)), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). Although it sheds light on the significance of his work on behalf of BMC, Martin's title does not compel the finding that he was a BMC employee.

Fourth, Plaso alleges that BMC considered her an employee when it demanded in unrelated litigation that her communications with BMC's counsel were privileged. This claim is unsupported by the record, which demonstrates that BMC and Plaso never agreed upon the basis of such a privilege. Although Plaso's communications with BMC's counsel were ultimately treated as privileged, BMC's counsel—despite Plaso's insistence that she be considered a BMC employee—rejected this characterization.

For the reasons stated, we reject Plaso's argument that the District Court failed to adequately consider the evidence of record. We next consider whether this evidence raises a genuine dispute of material fact.

B

In determining whether an entity is an "employer" for purposes of Title VII, we consider the factors articulated in *National Mutual Insurance Co. v. Darden*, 503 U.S. 318, 323–24 (1992).[3] The essence of the *Darden* test is whether the hiring party has the "right to control the manner and means by which the product is accomplished." *Id.* at

---

[3] The court may consider the following non-exhaustive list of factors: (1) "the skill required"; (2) "the source of the instrumentalities and tools"; (3) "the location of the work"; (4) "the duration of the relationship between the parties"; (5) "whether the hiring party has the right to assign additional projects to the hired party"; (6) "the extent of the hired party's discretion over when and how long to work"; (7) "the method of payment"; (8) "the hired party's role in hiring and paying assistants"; (9) "whether the work is part of the regular business of the hiring party"; (10) "whether the hiring party is in business"; (11) "the provision of employee benefits"; and (12) "the tax treatment of the hired party." *Darden*, 503 U.S. at 323–24 (citation and internal quotations omitted).

8

323. We have held that courts applying *Darden* may focus on three indicia of control: (1) which entity paid plaintiff; (2) who hired and fired plaintiff; and (3) who "had control over [plaintiff's] daily employment activities." *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 119 (3d Cir. 2013) (citation and internal quotations omitted).

Contrary to our holding in *Covington*, Plaso claims the District Court erred by focusing on those three indicia instead of applying all twelve *Darden* factors, nine of which she claims are in her favor. We are unpersuaded, for as the Supreme Court stated in *Darden* itself: "Since the common-law test contains no shorthand formula or magic phrase that can be applied to find the answer [of employment], . . . all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." *Darden*, 503 U.S. at 324 (citation and internal quotations omitted). The District Court engaged in a detailed, considered discussion of the three *Covington* indicia and, in a footnote, acknowledged the relevance of the other nine *Darden* factors. It found, quite correctly, that Martin and Healthcare (not BMC) controlled Plaso's employment and her daily tasks.

Similarly, Plaso's reliance on *Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C. Cir. 1973), is misplaced. There, the D.C. Circuit held that a private nurse, who was retained and compensated by hospital patients, could state a claim under Title VII against

9

the hospital where he worked. *Id.* at 1344. Sibley sued for gender discrimination because the hospital would not refer him to patients requesting a private nurse whenever the patient was female. *Id.* at 1339–40. Plaso claims that Sibley was an "employee" by virtue of his physical presence in the hospital building, analogizing his situation to her case. In fact, Sibley was deemed *not* an employee of the hospital, although he was protected by Title VII because the hospital blocked his access to employment. *Id.* at 1342. This rationale does not apply to Plaso's suit, as BMC had no authority to affect Plaso's employment.

Nor do we find that the District Court erred, as Plaso contends, in its joint employment determination. Under *Graves v. Lowery*, 117 F.3d 723 (3d Cir. 1997), a joint employment relationship exists when "two entities exercise significant control over the same employees." *Id.* at 727 (citations omitted); *see also Nat'l Labor Relations Bd. v. Browning-Ferris Indus. of Pa., Inc.*, 691 F.2d 1117, 1123 (3d Cir. 1982). When determining whether an entity exercises significant control with another employer, district courts in the Third Circuit have assessed the following factors: (1) the entity's "authority to hire and fire employees, promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours"; (2) its "day-to-day supervision of employees, including employee discipline"; and (3) its "control of employee records, including payroll, insurance, taxes and the like." *See, e.g., Abdallah v.*

10

*Allegheny Valley Sch.*, No. 10-5054, 2011 WL 344079, *3 (E.D. Pa. Feb. 1, 2011); *Butterbaugh v. Chertoff*, 479 F. Supp. 2d 485, 491 (W.D. Pa. 2007); *Cella v. Villanova Univ.*, No. 01-7181, 2003 WL 329147, *7 (E.D. Pa. Feb. 12, 2003). Here, the District Court reviewed these three factors, noting that only Healthcare paid Plaso's salary and business expenses, maintained employee records for her, and had the authority to terminate her. In addition, Martin outlined Plaso's day-to-day responsibilities, controlled how she could use BMC resources, and told her when to work. On the other hand, as the District Court aptly found, Kane and other BMC employees exercised only limited supervision over Plaso, which did not create a joint employment relationship.

Plaso claims the District Court focused entirely on her employment contract, which set forth the original terms of her employment at Healthcare, and thus failed to consider the evolution of her role and her increasing responsibilities at BMC. Again, she references her duties as program administrator for BMCMA, and she further argues that Kane "ultimately terminated" her employment.

As discussed above, however, the record demonstrates that Plaso's tenure as program administrator fell within her contractual duties as a Healthcare employee. Martin assigned her to the position, outlined her responsibilities, and instructed her when to stop performing that role. When Kane and other employees interacted with Plaso and offered feedback on her work, they did so within the confines of her assigned functions.

11

The District Court correctly turned to Plaso's employment contract as a touchstone for its analysis, but it did not do so to the exclusion of the other evidence in the record. Rather, the District Court explained how Plaso's work conditions at BMC—her constant communication with Martin, the fact that Martin controlled how she used BMC's equipment, and Martin's status as the only person to formally discipline her—comported entirely with the terms of her contract with Healthcare.

Similarly, the record does not support the inference that BMC "ultimately terminated" Plaso. Beyond mere allegations, Plaso offers no specific evidence that she was terminated, and for that matter, that BMC played a role in terminating her role at the hospital. Though Plaso stopped working in June 2010, BMC presented evidence that she remained on Healthcare's payroll until at least October 2010. Thus, Plaso's argument that BMC was her "joint employer" is unconvincing.

Accordingly, we find no error in the District Court's detailed consideration of *Darden* and *Graves*, respectively, and affirm its conclusions that BMC constitutes neither Plaso's "employer" nor "joint employer" for purposes of Title VII.[4]

---

[4] Because the employment analysis under the NJLAD is substantially similar to that for Title VII, we also hold there is no genuine issue of material fact supporting Plaso's contention that BMC was her employer or joint employer under that law. *See Lehmann v. Toys 'R' Us, Inc.*, 626 A.2d 445, 600 (N.J. 1993) (holding that Title VII precedent is "a key source of interpretive authority" when construing provisions of the NJLAD) (citation omitted).

C

Plaso also argues that the District Court erred in finding that BMC and Healthcare were not a single employer under the "integrated enterprise" theory. Whether we should consider two entities as an integrated enterprise "rests on the degree of operational entanglement—whether operations of the companies are so united that nominal employees of one company are treated interchangeably with those of another." *Nesbit v. Gears Unltd., Inc.*, 347 F.3d 72, 87 (3d Cir. 2003). Relevant operational factors include: (1) the unity of ownership, management, and business functions; (2) whether the entities present themselves as a single entity to third parties; (3) whether the parent company indemnifies the expenses or losses of its subsidiary; and (4) whether one entity does business exclusively with the other. *Id.*

In our view, the evidence Plaso presents in support of this theory is legally insufficient. As a threshold matter, Plaso did not allege in her complaint that BMC and Healthcare constitute a single employer. Further, it is undisputed that BMC and Healthcare are independent legal entities, and Plaso has not proffered evidence that they

Plaso contends that the District Court's succinct treatment of her NJLAD claim glossed over the multi-factored test for employment set forth by *Pukowsky v. Caruso*, 711 A.2d 398, 404 (N.J. Super. Ct. App. Div. 1998). We do not find that a "principled application" of *Pukowsky* would yield a different outcome. *See id.* at 405 ("We cannot perceive how the standards set forth in the federal cases could have been construed more broadly to warrant a different result [under the NJLAD].").

13

are united in ownership, management, or purpose. Although Plaso represented BMC to third-party physicians in the community in her capacity as BMCMA's administrator, she did so as an independent contractor and not as a BMC employee. Similarly, Healthcare performed its own administrative functions, as it maintained its own employee records, paid Plaso's salary, and reimbursed Plaso for her business expenses. Healthcare also served other clients, and indeed, Plaso was assigned to other medical centers during her time with the company. Accordingly, Plaso cannot sustain her Title VII and NJLAD claims under the integrated enterprise theory.

D

Finally, Plaso maintains that the District Court erred in granting summary judgment on her claims as an independent contractor under the NJLAD for *quid pro quo* discrimination and retaliatory discharge. Perhaps because of the multiplicity of her claims, Plaso failed to alert the District Court to this NJLAD argument in her memorandum of law opposing summary judgment, instead discussing her *quid pro quo* discrimination and retaliation claims solely "in the context of a suit brought under Title VII." Pl.'s Mem. Opp'n Summ. J. 25, Apr. 1, 2013, ECF No. 30. Thus, the District Court reasonably looked only to Title VII. However, because Plaso "offer[ed] only citations to the NJLAD and New Jersey case law . . . [and] no support for her conclusion

14

that pertains to Title VII," it found her Title VII argument unpersuasive.[5]

Plaso contends that this omission was a mere "typo" and that her NJLAD claims should be considered.  Even were we to accept this explanation, Plaso's NJLAD arguments fail on their merits.  NJLAD's goods and services subsection, N.J. Stat. Ann. § 10:5-12(l),  prohibits the *quid pro quo* sexual harassment of an independent contractor, as well as her discriminatory termination from a contract.  *See, e.g.*, *J.T.'s Tire Service, Inc. v. United Rentals N. Am., Inc.*, 985 A.2d 211, 215 (N.J. Super. Ct. App. Div. 2010).  But the alleged sexual harassment at issue here was inflicted only by Martin, and Plaso has not articulated why BMC should be held liable for Martin's conduct.  Further, as discussed earlier, Plaso has not offered evidence either that she was terminated or that BMC instigated the end of her tenure at the hospital.  As such, her NJLAD claims for *quid pro quo* discrimination and retaliatory discharge must fail.

### III

For the reasons stated, we will affirm the judgment of the District Court.

---

[5] Plaso has waived her claim with respect to Title VII.  *See supra* note 4.

15